IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**VALERIE D. MASON-COLWELL,**              Case No. 3:15 CV 1790

    Plaintiff,                              Judge Jack Zouhary

    v.                                     Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                             REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Valerie D. Mason-Colwell ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated September 3, 2015). Following review, the undersigned recommends the Court affirm the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits in April 2013, alleging disability as of July 2005 due to "spots on right lung, back hurts and freeze[s] up, both hips lock up hard to stand and walk, depression, anxiety, [and] stress". (Tr. 9, 69). The claim was denied initially and on reconsideration. (Tr. 69-123). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at an administrative hearing on February 3, 2015. (Tr. 28-68). The VE also responded to written interrogatories following the hearing. (Tr. 347-50). On May 15, 2015, the administrative law judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled. (Tr. 6-21). The

Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1). Plaintiff filed the instant action on September 3, 2015. (Doc. 1).

### FACTUAL BACKGROUND

Personal and Vocational Background

Plaintiff was born on May 30, 1964, and has a high school education. (Tr. 20, 34). She has past relevant work as a hand packager and production assembler. (Tr. 19-20, 58).

Relevant Medical Evidence

***Physical Evidence***

On March 9, 2009, Michael J. Pole, M.D., noted a chest x-ray revealed no evidence of acute chest disease, but did show a large granuloma or hamartoma superior segment in the right lower lobe. (Tr. 380).

A CAT scan of the thorax on June 4, 2009, revealed a huge calcified nodule along the posterior basal segment of the right upper lobe, compatible with a granuloma and two small indeterminate nodules along the anterior segment of the right upper lobe. (Tr. 423). Edmundo A. Somoza, M.D. recommended follow up of the two nodules in six months. *Id.*

On July 15, 2009, Plaintiff had a follow-up appointment due to complaints of migraine headaches and blurred vision for four weeks. (Tr. 392). She also complained of numbness in her right arm and fingers for two weeks and stated her children noticed she was slurring her words. *Id.* A physical examination was unremarkable. (Tr. 393). Plaintiff was diagnosed with a headache and blurry vision after a CAT scan revealed asymmetric ventricles with the left side larger than the right, probably secondary to a normal variant. (Tr. 356, 422).

2

Plaintiff complained of lower back pain and right hip pain at the emergency room on August 19, 2010. (Tr. 415). Plaintiff stated she was unable to maintain her gait while walking. *Id*. Following a physical examination of her back, Richard Baldwin, M.D., noted she "seems to be overacting just with a slight touch of the skin. Patient response is inappropriate compared to the pain [she] is experiencing." *Id*. He noted there was mild tenderness in the L2 to L5 area. *Id*.

The same day, a CAT scan of Plaintiff's abdomen and pelvis revealed no definite evidence of an obstructive uropathy or radiopaque calculus, and a hypodense structure along the lateral aspect of the mid portion of the left kidney, which was probably cystic in nature. (Tr. 417). X-rays of the right hip did not show any bony or joint abnormality. (Tr. 418). Lumbar spine x-rays revealed degenerative changes, including mild spurring throughout the spine and mild osteoarthritis at L4-L5-S1. (Tr. 419). Dr. Baldwin diagnosed Plaintiff with acute lower back pain, and right hip pain and strain. (Tr. 416).

At an appointment on March 19, 2013, Plaintiff complained of chest pain, dry cough, and a headache. (Tr. 407, 477). A chest x-ray showed a 3.2cm nodule along the inferior aspect of the right upper lobe, but the heart was not enlarged and both costophrenic sinuses were sharp. (Tr. 410). A CT scan revealed no definite evidence of a pulmonary embolism; some increase in the size of the calcified nodule when compared with results from June 2009; some peribronchial thickening; and no significant interval change concerning the smaller nodules along the right upper lobe. (Tr. 409). Dr. Zakir Husain, M.D., diagnosed her with pneumonia. (Tr. 408, 478).

Plaintiff had an appointment on April 3, 2013, to establish new patient care, where she complained of back and hip pain. (Tr. 582). She was assessed with chest pain, shortness of

3

breath, elevated blood pressure without diagnosis of hypertension, and other abnormal glucose. (Tr. 586).

At an appointment on April 26, 2013, Plaintiff complained of left leg pain, chest pain, trouble breathing, headaches, and nose bleeds. (Tr. 572). She stated she did not check her blood sugars at home; and had not undergone a recent eye examination, foot check, or oral hygiene evaluation. (Tr. 573). Plaintiff reported dyspnea and chest discomfort, triggered by exercise, exertion, deep inspiration, coughing, and smoking. *Id.* She reported compliance with medication, but not with recommended levels of diet and exercise. *Id.* Plaintiff was assessed with diabetes mellitus, type II, dyspnea, chest pain, and epistaxis. (Tr. 576). She was advised to go to the emergency room if she experienced chest pain. (Tr. 573).

That same day, Plaintiff went to the emergency room complaining of chest pain, occasional productive cough, and subjective fever and chills. (Tr. 426, 495). She had no swelling of the arms or legs, and no difficulty breathing. (Tr. 426). An EKG showed normal sinus rhythm. (Tr. 427). Tests revealed a 2.2cm non-calcified nodule in the right perihilar region, but no evidence of pulmonary infiltrates or acute pulmonary pathology. (Tr. 439-42, 497-99, 507). She was diagnosed with atypical chest pain and prescribed Zithromax. (Tr. 427).

Plaintiff had an appointment on May 3, 2013, for follow up with regard to chest pain and shortness of breath. (Tr. 566). The treatment provided stated she was not yet diabetic at this point and discussed ways to prevent further disease progression, including healthier eating and exercise. (Tr. 567). A foot examination revealed Plaintiff had sensation in all areas and a visual exam was normal. *Id.* She reported her chest pain was slightly better, but continued to report

4

shortness of breath with exertion. *Id.* Later in May, she complained of leg pain and swelling, an inability to straighten her leg, and knee pain and "popping". (Tr. 545-46).

Plaintiff complained of numbness in her hands and feet, and neck fullness at an appointment on August 6, 2013. (Tr. 560). The record reveals her "arm numbness [was] very subjective". *Id.* She was assessed with other abnormal glucose, proteinuria, and shortness of breath. (Tr. 564). A few days later, Edmundo Somoza, M.D., diagnosed Plaintiff with a thyroid disorder after a sonogram revealed three ovoid, hypoechoic structures along the right lobe of the thyroid, possibly representing small adenomas. (Tr. 476).

At an appointment on September 11, 2013, Plaintiff complained of mild chest tightness and shortness of breath, aggravated by exercise. (Tr. 551). She was noncompliant with some prescription medication. *Id.* The treatment provider noted Plaintiff's obesity could have been causing her shortness of breath with exertion. (T. 552).

On September 16, 2013, following a sleep study, James A. Tita, D.O., diagnosed Plaintiff with obstructive sleep apnea and inadequate sleep hygiene. (Tr. 500-02). A CPAP study a few weeks later confirmed Plaintiff had obstructive sleep apnea. (Tr. 503-05).

On January 9, 2014, Plaintiff complained of waking up in the middle of the night short of breath. (Tr. 529). At that time she was taking an albuterol inhaler and other medication. *Id.* She also reported chest pain and high stress levels. *Id.* Also in January, chest x-rays revealed findings consistent with an old granulomatous disease. (Tr. 737).

Plaintiff had an appointment on April 30, 2014, for evaluation of a thyroid nodule. (Tr. 518). She reported dysphagia, hoarseness, neck tenderness, and neck fullness. *Id.* She denied neck pain, alopecia, lethargy, pretibial edema, irritability, muscle weakness, and palpitations. *Id.*

A physical examination of her neck revealed a normal cervical range of motion; normal gland size; no nodules or masses present on palpation; gland position midline; and a normal thyroid motion during swallowing. (Tr. 521). The assessment included mixed incontinence, shortness of breath, abnormal radiological findings, and acute pharyngitis. (Tr. 522).

On May 14, 2014, Plaintiff complained of cough, shortness of breath, and wheezing. (Tr. 705). She reported disturbed sleep, but admitted to irregular use of her CPAP machine. *Id.* Later in May, Plaintiff had an appointment with Shetty Shivaprasad, M.D., to establish new patient care. (Tr. 687). Dr. Shivaprasad diagnosed her with type II or unspecified type diabetes mellitus without mention of complication, not stated as uncontrolled; asthma, mild persistent, uncomplicated; depression; hypertension; multiple lung nodules; and obesity. (Tr. 690). It was noted that a recent neck CT scan for throat discomfort was normal. (Tr. 693).

In early October 2014, Plaintiff complained of leg and back pain, stating it was painful to walk, sit, and stand. (Tr. 645, 652). Plaintiff had no leg swelling. (Tr. 652). X-rays of the lumbar spine revealed mild degenerative disc disease. (Tr. 711).

***Psychological Evidence***

At an appointment on June 15, 2009, for a cough and headache, Plaintiff reported depression, excessive sleeping, and intermittent crying. (Tr. 394-95). She denied any thoughts of harming herself or others. (Tr. 395). Plaintiff was assessed with neurotic depression, prescribed medication, and strongly encouraged to seek counseling. *Id.*

Plaintiff had appointment at Maumee Valley Guidance Center on March 6, 2013. (Tr. 464). She complained of irritability, crying spells, poor appetite, difficulty sleeping, low energy, and worsening memory. *Id.* Jerrold Gray, M.D., noted Plaintiff was alert, cooperative, casually

6

dressed, adequately groomed, obese, and generally goal directed. (Tr. 465). Her speech was normal in rate, rhythm, and volume. *Id.* Plaintiff had a full range affect and intact attitude. *Id.* She denied guilt feelings, hopelessness, helplessness, passive death wish, suicidal or homicidal ideation, delusions, auditory or visual hallucinations, obsessions, or compulsions. *Id.* Dr. Gray noted she demonstrated slight fidgeting with her hands and slight bilateral hand tremors. *Id.* He diagnosed her with depressive disorder not otherwise specified, a learning disorder not otherwise specified, and assigned a global assessment of functioning ("GAF") score of 55.[1] (Tr. 466).

On May 13, 2013, Plaintiff reported her stable and euthymic mood had recently deteriorated. (Tr. 770). Dr. Gray increased her medication and assigned a GAF score of 47.[2] *Id.* A few days later, Plaintiff had an appointment at Maumee Valley Guidance Center, where she had regular appointments with both Dr. Gray and other therapists. (Tr. 462). Plaintiff had a variable mood with some depression and irritability, a slightly constricted affect. *Id.* She reported sleep difficulty due to her grandson staying awake late. *Id.* The therapist noted she showed progress. (Tr. 462-63).

In July 2013, Plaintiff demonstrated a depressed mood, and full and broad affect. (Tr. 487). In August 2013, Dr. Gray increased her medication, encouraged her to follow-up with

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.
2. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR*, at 34.

individual therapy and a psychiatric RN. (Tr. 486). In October 2013, Plaintiff reported an "okay" energy level, but difficulty with concentration and memory. (Tr. 792).

In early 2014, Dr. Gray assigned a GAF of 50[3] and increased her medication. (Tr. 785). In April 2014, Plaintiff reported mildly depressed mood, and occasional irritability and tearfulness, but no recent passive death wish or suicidal ideation while awake. (Tr. 778). She reported that since a medication increase she was better able to control her anger. *Id.* Dr. Gray assigned a GAF score of 45.[4] *Id.*

An appointment on August 6, 2014, Plaintiff reported a mildly depressed mood, lack of motivation, rapid speech, racing thoughts, irritability, impulsivity, and sleep disturbance—partly due to her grandson's insomnia and disturbing behavior. (Tr. 764). Dr. Gray increased her medication and advised her to follow up with individual therapy. *Id.*

In September 2014, Plaintiff went to the emergency room complaining of depression and shortness of breath. (Tr. 631). She complained of poor concentration, difficulty sleeping, auditory hallucinations, hopelessness, helplessness, and suicidal ideation. *Id.* James Kettinger, M.D., diagnosed her with major depression with panic attack and atypical chest pain. (Tr. 632). He transferred her to the Coping Center. *Id.*

From September 25, 2014, to October, 2, 2014, Plaintiff was hospitalized for psychological problems, including suicidal ideations. (Tr. 589). Sandra Vonderembse, M.D., diagnosed her with major depressive disorder, rule out psychotic features, and borderline intellectual functioning. (Tr. 600-05).

---

3. *See DSM-IV-TR*, *supra*, note 2.
4. *See DSM-IV-TR*, *supra*, note 2.

8

A mental status exam on October 29, 2014, revealed Plaintiff was oriented to all spheres, with linear and organized speech, intact memory, past auditory hallucinations, and visual hallucinations. (Tr. 760-61). Katherine Schoreder, MSW, LSW, diagnosed her with depressive disorder not otherwise specified and assigned a GAF score of 50.[5] (Tr. 761).

On November 5, 2014, Plaintiff reported to Dr. Gray she was doing "terrible". (Tr. 758). A mental status exam revealed she was cooperative, casually dressed, adequately groomed, and obese. (Tr. 759). She fidgeted with her hands and had mild bilateral hand tremors, but no psychomotor retardation. *Id.* Plaintiff demonstrated hopelessness, a mildly constricted affect, a mildly decreased self-attitude, and normal and goal directed speech. *Id*. She denied guilt feelings, helplessness, and hallucinations. *Id*. Dr. Gray noted Plaintiff reported partial improvement in her depressed mood with resolution of suicidal ideation; and no recent episodes of elevated mood, racing thoughts, or impulsive behavior or grandiosity. *Id*. She did report some episodes of rapid speech and occasional irritability. *Id.*

Plaintiff was seen at the Maumee Valley Guidance Center on January 21, 2015, for follow up. (Tr. 751). She reported some difficulty with life stressors and coping. *Id.* She was not compliant with medication. *Id*. Plaintiff complained of intermittent sadness, sleep irregularity, fatigue, poor energy, poor appetite, poor concentration, difficulty concentrating, lack of motivation, crying spells, visual and auditory hallucinations, and anxiety. *Id*. She reported no headaches, dizziness, or weakness. *Id*. Plaintiff exhibited mild to moderate sadness, anxiety, and irritability. *Id.* She was adequately groomed; oriented to person, place, and time; with fair eye contact; fair hygiene; slowed language; concrete thought process with no evidence of paranoia or

---

5. *See DSM-IV-TR*, *supra*, note 2.

delusions; depressed mood; flat affect; normal recent and remote memory; and questionable judgment and insight. (Tr. 751-52). She was diagnosed with major depressive disorder (recurrent, severe with psychotic features) and assigned a GAF score of 51.[6] (Tr. 752).

A progress note from the Maumee Valley Guidance Center dated January 23, 2015, revealed Plaintiff had made progress in therapy and was not a danger to herself. (Tr. 749-50). Plaintiff stated she was taking her medication as prescribed, using healthy coping skills, and focusing on self-care. (Tr. 750).

Opinion Evidence

**Function Report**

On May 3, 2013, Tricia Barton, MOT, OTR/L, FCE CP, completed a functional capacity evaluation. (Tr. 451-54). Plaintiff reported constant pain of eight on a ten-point scale, and numbness and tingling. (Tr. 456). Standing made the pain worse and nothing relieved it. (Tr. 457). Plaintiff stated it was difficult for her to stand, walk, climb stairs, lift, and carry objects. *Id.* Following physical examination and testing, Ms. Barton determined Plaintiff may be able to tolerate work in a sedentary to light physical demand level. (Tr. 454). Ms. Barton noted Plaintiff did not show consistent effort during the evaluation. *Id.*

**State Agency Examiners**

On July 22, 2013, state agency reviewer Carl Tishler, Ph.D., determined Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 73, 85). Dr. Tishler noted Plaintiff was moderately limited in her ability

_____

6. *See DSM-IV-TR*, *supra*, note 1.

10

to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 76-77, 88-89).

A second psychological state agency reviewer Aracelis Rivera, Psy.D., affirmed these conclusions on September 19, 2013, with the exception that she found Plaintiff had no limitation in her ability to ask simple questions or request assistance. (Tr. 100, 103-05, 113, 116-18).

On July 25, 2013, state agency reviewer Dimitri Teague, M.D., determined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry about 10 pounds; stand, walk, and sit for a total of about 6 hours in an 8-hour workday; and had no other limitations. (Tr. 75, 87).

On September 19, 2013, a second physical state agency reviewer Rannie Amiri, M.D., affirmed these determinations. (Tr. 102-03, 115-16). Dr. Amiri added Plaintiff could frequently climb ramps, stairs, ladders, ropes, scaffolds, stoop, and crawl; and had no restrictions with balancing, kneeling, or crouching. *Id.*

*Physical Consultative Examination*

Dr. Babatunde Onamusi examined Plaintiff in February 2015. (Tr. 794-808). Dr. Onamusi determined Plaintiff was able to sit for 45 minutes, stand for 20 minutes, walk half a block, and lift 10 pounds. (Tr. 798). He noted Plaintiff reported pain and difficulty with bending and occasional numbness and tingling in her hands; but she could perform housework, laundry, grocery shopping at her own pace with help, personal grooming activities, and gross and fine motor tasks with her hands. (Tr. 798-99).

The physical examination revealed she was alert and oriented in time, place, and person. (Tr. 799). Her speech was fluent, articulate, and coherent. *Id.* Plaintiff's thought process was rational, attention span satisfactory, and she had no difficulty sustaining conversation. *Id.* Plaintiff walked with a mildly antalgic gait, but had no trouble transferring onto or off the examination table and did not require an assistive device for ambulation or transfer. *Id.* She declined squatting and walking on the heels or on the toes due to pain in her back. *Id.* Plaintiff was able to grip and grasp with both hands, grip strength in the right hand was 60 pounds and 50 pounds in the left hand. *Id.* She was able to reach forward; push or pull with the upper extremities; use her hands for fine coordination and manipulative tasks; tie knots, close buttons, tie shoelaces, pick up coins, hold pens, turn door handles, pull zippers; and perform fine fingering movements. *Id.* An examination of her back revealed a symmetrical spine with restricted motion and moderate degree of tenderness along the lumbar segments of the spine, but no paraspinal muscle spasms. (Tr. 799-800). A straight leg raise was negative bilaterally. (Tr. 800).

Dr. Onamusi assessed her with chronic lower back pain "probably degenerative with mild to moderate functional impairment" and determined she was able to engage in light physical demand level activities. *Id.* He further determined she could lift and carry up to 20 pounds occasionally; sit for 7 hours, stand for 4 hours, and walk for 3 hours in an eight-hour workday; (Tr. 803-04). Dr. Onamusi stated she would not require the use of a cane to ambulate. (Tr. 804). He also noted she could frequently use both hands to reach, handle, finger, and feel; and occasionally use them to push/pull. (Tr. 805). She could occasionally climb stairs and ramps, balance, stoop, and kneel; but never climb ladders or scaffolds, crouch, or crawl. (Tr. 806). Plaintiff could occasionally be exposed to unprotected heights, moving mechanical parts, operate a motor vehicle, and vibrations; but never humidity, wetness, dusts, odors, fumes, pulmonary irritants, and extreme cold and heat. (Tr. 807).

***Psychological Consultative Examination***

Brithany Pawloski, Psy.D., clinical psychologist, examined Plaintiff in February 2015 and completed a medical source statement with regard to Plaintiff's ability to perform work-related activities. (Tr. 809-22). Plaintiff reported she lived independently, but a home nurse visited her regularly to help with medication and physical therapy. (Tr. 810). She reported graduating high school with special education classes. *Id*. Plaintiff was able to cook and feed herself without difficulty, shower regularly, and take care of a pet bird. *Id*. She arrived to the appointment on time by taking public transportation. (Tr. 811). Plaintiff was appropriately dressed with appropriate hygiene. (Tr. 811-12). Dr. Pawloski noted Plaintiff generally did not display any bizarre behaviors, and was soft but clear in her communication. (Tr. 812). She demonstrated a well-organized and logical thought process, but reported visual and auditory

13

hallucinations. *Id*. Plaintiff had a flat and generally low affect and reported thoughts of suicide, but no plan or intent to do so. *Id*. Dr. Pawloski noted Plaintiff was fully oriented, presented with average intellectual functioning, and her performance on tasks of attention and concentration was generally within normal limits. *Id*. She presented with limited insight into her difficulties, but her judgment appeared within normal limits. *Id.*

Dr. Pawloski diagnosed Plaintiff with major depressive disorder (recurrent, with psychotic features). *Id*. She determined Plaintiff's mood difficulties were likely to impact her in the domain of understanding, remembering, and carrying out instructions—due to fatigue and low motivation. (Tr. 813). In the domains of maintaining attention and concentration and maintaining persistence and pace to perform simple and multistep tasks, Dr. Pawloski noted Plaintiff had no difficulty, but that as tasks become more difficult and demanding, her mood difficulties would have a regular impact on her abilities to perform. (Tr. 814). Dr. Pawloski noted Plaintiff's mood difficulties would also impact her ability to appropriately engage with supervisors and coworkers because she would have a tendency to be highly irritated due to a low frustration tolerance. *Id.* Finally, in the domain of responding appropriately to pressure in the work setting, Dr. Pawloski determined that "[g]iven her current reported symptoms and limited impact of her medication [it] is anticipated that she would have difficulties appropriately coping with exposure to work and would be at risk for further mental deterioration." *Id*.

She concluded Plaintiff had no limitations in her ability to understand and remember simple instructions or carry out simple instructions; mild limitation[7] in her ability to interact

---

7. Mild limitation means "[t]here is a slight limitation in this area, but the individual can generally function well." (Tr. 820).

appropriately with the public and co-workers; moderate limitation[8] in her ability to make judgments on simple work-related decisions and understand and remember complex instructions; and marked limitation[9] in her ability to carry out complex instructions and make judgments on complex work-related decisions. (Tr. 820).

<u>Hearing Testimony</u>

Plaintiff testified she read at a second grade level, but could perform basic math equations. (Tr. 34). Plaintiff stated she was unable to work because of difficulty standing and sitting due to low back pain and problems with her back and legs. (Tr. 38). She had taken pain medication for low back pain since 1998. *Id.* Plaintiff stated she had a hip joint deformity since birth that affected her ability to sit or walk on occasion. (Tr. 39-40). She reported suffering from migraines, asthma, obstructive sleep apnea, and diabetes. (Tr. 40-44). Plaintiff regularly saw a psychiatrist due to hallucinations and regularly visited a therapist due to depression and anxiety. (Tr. 41-43). Plaintiff stated she was hospitalized for three weeks in 2014 due to her mental impairments. (Tr. 42). She had problems with her feet and hands swelling up, and numbness and tingling in her feet. (Tr. 43). Plaintiff stated she had nodules on her right lung which caused her to have trouble breathing. (Tr. 44).

Plaintiff reported she could prepare meals and wash dishes, but had to sit in a chair to do so. (Tr. 45-46). However, with breaks, she was able to vacuum, grocery shop, and take care of her personal needs. (Tr. 46-47, 50-52). Plaintiff spent most of her day in a reclined position with her legs elevated. (Tr. 47). Plaintiff stated she could only walk a couple of steps before

---

8. Moderate limitation means "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (Tr. 820).
9. Marked limitation means "[t]here is serious limitation in this area. There is a substantial loss in the ability to effectively function." (Tr. 820).

experiencing pain and becoming short of breath, and could stand no more than fifteen minutes. (Tr. 47-48). She could lift a gallon of milk with both hands, but had difficulty grabbing and would drop things. (Tr. 48-49). Plaintiff stated she never socialized with family or friends. (Tr. 49).

The ALJ asked the VE about the work ability of a hypothetical individual with the same work history and education as Plaintiff, and with the capacity to:

1. perform light exertional work;

2. occasionally climb stairs and ramps;

3. occasionally stoop, kneel, crouch, and crawl;

4. understand, remember, and carry out simple repetitive tasks and make simple work-related decisions;

5. perform work that is not fast-paced and has no strict time or high quota demands;

6. work in a routine work setting with only occasional changes in the work routine;

7. but must be given verbal or demonstrated instructions and with no significant requirement for reading or writing, but could not do so on a daily basis.

The VE determined the individual would not be able to perform any of Plaintiff's past work. (Tr. 60-61). However, the VE noted that individual would be able to perform other jobs. (Tr. 61-62).

The VE also noted the hypothetical individual, if limited to sedentary exertional work, could still perform other jobs. (Tr. 62-63). The VE determined that if the hypothetical individual was on task for 80% or less of the workday or absent from work two or more days per month there would be no jobs she could perform. (Tr. 63). If the individual was required to elevate her

16

feet to knee level one-third of the workday, the VE stated there would be no work she could perform. *Id*.

ALJ Decision

On May 15, 2015, the ALJ issued an unfavorable decision, making the following findings of fact and conclusions of law:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011.

2. Plaintiff had not engaged in substantial gainful activity since July 15, 2005, the alleged onset date.

3. Plaintiff had the following severe impairments: mild lumbar arthritis; chronic obstructive pulmonary disease (COPD); diabetes mellitus, type 2; migraine headaches; sleep apnea; hypertension; obesity; major depressive disorder; borderline intellectual functioning; anxiety disorder, not otherwise specified; and learning disorder, not otherwise specified.

4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. Plaintiff had the residual functional capacity to perform light work except that she could sit for seven hours, stand for four hours, and walk for three hours, each in an eight-hour workday; occasionally climb stairs and ramps, balance, stoop, and kneel, but never climb ladders, ropes or scaffolds, and never crouch or crawl; frequently reach, handle, finger, feel and operate foot controls bilaterally; occasionally push and pull; must avoid all exposures to extreme cold and heat, humidity, wetness, and fumes, odors, dusts, gas, and poor ventilation, etc.; avoid concentrated exposure to unprotected heights, moving mechanical parts, and vibrations; is able to understand, remember, and carry out simple, routine tasks, and make simple work related decisions, that are not fast paced and have no strict time or high quota demands, and that are in a routine work setting that have only occasional changes in the work routine.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was born on May 30, 1964, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age.

8. Plaintiff had at least a high school education and was able to communicate in English.

9. Transferability of job skills was not an issue in the case because Plaintiff's past relevant work was unskilled.

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy Plaintiff could perform.

11. Plaintiff had not been under a disability, as defined in the Social Security Act, from July 15, 2005, through the date of this decision.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

19

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff asserts the ALJ erred (1) in weighing psychological consultative examiner Dr. Pawloski's opinion, and (2) in his RFC determination, which she alleges is unsupported by substantial evidence.

### *Dr. Pawloski's Opinion*

Plaintiff argues the ALJ erred in his analysis of the consultative examiner Dr. Pawloski's opinion. Plaintiff asserts that because the ALJ gave the opinion significant weight, he was therefore required to adopt Dr. Pawloski's conclusions that Plaintiff was reliable and that exposure to a work environment would damage her mental health. (Doc. 14, at 15). The ALJ, however, was required to adopt neither.

Under the regulations, there exists a hierarchy of medical opinions: first is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

When evaluating any medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating

20

source. *Id*.

Non-examining sources are physicians, psychologists, or other acceptable medical sources that have not examined the claimant, but review medical evidence and provide an opinion. § 416.902. The ALJ will consider the findings of these non-examining sources as opinion evidence, except as to the ultimate determination about whether Plaintiff is disabled. § 416.927. "[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 824.

First, the fact that the ALJ gave significant weight to Dr. Pawloski's opinion without adopting it verbatim does not automatically indicate the ALJ's RFC, and subsequent Step Five determination, is not supported by substantial evidence. The ALJ was not required to adopt Dr. Pawloski's opinion regarding Plaintiff's ability to work. Dr. Pawloski noted Plaintiff's work history "demonstrate[d] limited ability to maintain employment"; however, this is not a medical opinion. (Tr. 814). Indeed, there is a difference between medical opinions and an RFC finding. The ALJ, not a medical source, is tasked with making the latter determination. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). The two assessments are not synonymous, and need not be identical to be compatible. SSR 96-

5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). Therefore, the ALJ is only required to incorporate into the RFC those portions of Dr. Pawloski's opinion he finds credible.

Second, credibility determinations are reserved for the ALJ. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) ("Precedent in this circuit and agency rulings support the ALJ's conclusion that [the doctor's] opinion of [Plaintiff's] credibility addresses one of the issues reserved to the Commissioner and therefore is not a medical opinion requiring consideration."). Therefore, the ALJ was not required to adopt Dr. Pawloski's opinion that Plaintiff was reliable.

Third, Dr. Pawloski's determination that Plaintiff had no limitations in her ability to understand, remember, and carry out simple instructions; and her observation that Plaintiff's judgment appeared within normal limits is consistent with the ALJ's RFC. She limited Plaintiff to simple, routine tasks and simple work related decisions that are not fast-paced and have no strict time or high quota demands with only occasional changes in the work routine. (Tr. 812, 813-14, 820).

Fourth, the ALJ's RFC is consistent with Dr. Pawloski's opinion that Plaintiff's ability to concentrate and maintain attention was within normal limitations. (Tr. 814). It is also consistent with her determination that Plaintiff would have difficulty as tasks became more difficult and demanding—as the ALJ not only limited Plaintiff to simple tasks and decisions, but he also precluded tasks that were fast-paced or had strict time or high quota demands. (Tr. 15, 814).

22

Fifth, Dr. Pawloski stated Plaintiff's condition would impact her ability to appropriately engage with supervisors and coworkers, but concluded she had only mild limitation interacting with the public and co-workers and moderate limitation when interacting with supervisors. (Tr. 814, 820-21). Additionally, the ALJ appropriately pointed to evidence in the record which supported the determination that Plaintiff did not have a serious limitation in social functioning. (Tr. 13, 465, 487, 750, 759, 760-61, 778).

Finally, although Dr. Pawloski anticipated Plaintiff would have difficulties coping at work, she concluded Plaintiff had moderate limitation in responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 814, 820-21). The ALJ accounted for this by limiting work to only occasional changes in the work routine. (Tr. 14). Dr. Pawloski determined Plaintiff could still perform satisfactorily in all work functions not involving complex tasks. (Tr. 820-21). The ALJ's RFC is consistent with these findings and the ALJ was not required to adopt Dr. Pawloski's opinion verbatim.

### ALJ's RFC Determination

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe*, 342 F. App'x at 157 ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm. *Walters*, 127 F.3d at 528.

23

Here, Plaintiff specifically challenges the ALJ's physical RFC determination that Plaintiff could walk for three hours during an eight-hour workday and occasionally climb ramp/stairs, kneel, stoop, and balance. (Doc. 14, at 11-12). Plaintiff argues these limitations do not adequately reflect her ability. In making this determination, the ALJ relied on the opinions of a consultative examiner and two state agency reviewers. (Tr. 17). These uncontested opinions were given significant weight and are from reliable sources upon which to base an RFC. *See* 20 C.F.R. § 404.1527(e)(2)(i); *Vorholt v. Comm'r of Soc. Sec.,* 409 F.App'x 883, 887 (6th Cir. 2011) (holding an ALJ was justified in relying on the opinion of the state agency doctor). The ALJ gave Dr. Onamusi's opinion great weight because he personally observed and examined Plaintiff, and his opinion was consistent with objective findings in the record. (Tr. 17). The ALJ also gave the opinions of state agency reviewers Dr. Teague and Dr. Amiri significant weight, but because they did not personally examine Plaintiff, he adopted Dr. Onamusi's more restrictive limitations. *Id*.

Furthermore, there is ample evidence in the record to support the conclusion that Plaintiff remained capable of performing a restricted level of light work. A chest x-ray in March 2009 revealed no evidence of acute chest disease. (Tr. 380). On August 19, 2010, during a physical examination to assess pain, a doctor noted she appeared to be overreacting because her response was inappropriate compared to the pain she was experiencing. (Tr. 415). The doctor noted there was mild tenderness in the L2 to L5 area. *Id*. Hip x-rays did not reveal any bony or joint abnormality. (Tr. 418). Lumbar x-rays showed mild degenerative changes. (Tr. 419). After Plaintiff complained of chest pain, a chest x-ray showed nodules, but a CT scan revealed no definite evidence of a pulmonary embolism; she was diagnosed with pneumonia. (Tr. 408-10,

24

478). During an emergency room visit in April 2013, Plaintiff complained of chest pain, but had no swelling in the arms or legs, and no difficulty breathing. (Tr. 426, 495). An EKG showed normal sinus rhythm. (Tr. 427). Plaintiff complained of numbness in her hands and feet in August 2013, but the record reveals these complaints were "very subjective". (Tr. 560). After numerous complaints at an appointment in April 2014, a physical examination revealed a normal cervical range of motion, normal gland size, no tenderness, no nodules or masses, and normal thyroid motion during swallowing. (Tr. 521). In May 2014, Plaintiff complained of cough, shortness of breath, wheezing, and sleep disturbance, but admitted to irregular use of her CPAP machine. (Tr. 705). On May 30, 2014, it was noted a recent neck CT scan for throat discomfort was normal. (Tr. 693). In October 2014, Plaintiff complained of leg and back pain; she had no leg swelling and lumbar x-rays revealed mild degenerative disc disease. (Tr. 711).

The record also reveals frequent non-compliance with medication and treatment. (Tr. 533, 537, 540, 551, 573, 705, 751). It also reveals a significant amount of subjective complaints which, Plaintiff alleges, require her to take additional breaks. (Doc. 10, at 13). However, an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. The ALJ found Plaintiff not entirely credible and Plaintiff does not challenge that determination. (Tr. 15). Additionally, the question on review is not whether substantial evidence could support another conclusion, but, rather, whether substantial evidence supports the conclusion reached by the ALJ. *Jones,* 336 F.3d at 477. The undersigned believes it does.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the

25

undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp, II

United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).